## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 16 2016, 8:37 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Scott L. Barnhart
Brooke Smith
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Blake John Drapeau, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | February 16, 2016 <br><br> Court of Appeals Case No. <br> 82A01-1506-CR-616 <br><br> Appeal from the Vanderburgh Circuit Court <br><br> The Honorable David D. Kiely, Judge <br><br> Trial Court Cause No. <br> 82C01-1501-F6-453 |

**Najam, Judge**

## Statement of the Case

Blake Drapeau appeals his conviction for criminal trespass, as a Class A misdemeanor, and resisting law enforcement, as a Class A misdemeanor, following a bench trial. Drapeau raises three issues for our review, which we consolidate and restate as follows:

1. Whether the State presented sufficient evidence to support his convictions for criminal trespass and resisting law enforcement.

2. Whether there was a material and fatal variance between the crime of criminal trespass charged and the theory and evidence of criminal trespass presented at trial.

We affirm.[1]

## Facts and Procedural History

Sandra Beauchamp, Drapeau's mother, lived at an apartment complex in Evansville. She and her boyfriend, Paul, were the only persons listed as the leaseholders of the apartment. However, Drapeau had a key to Beauchamp's apartment and he periodically stayed there in a bed that was set up for him. He also kept his clothing at his mother's apartment and used his food stamps to buy food that he sometimes shared with his mother and her boyfriend.

---

[1] We heard oral argument in this case at Vincennes University on January 26, 2016.

[4]     As of November 4, 2012, the management of the apartment complex and an Evansville police officer had banned Drapeau from the complex where his mother's apartment was located. That information was placed on an alert system available to the local police, and Drapeau also had personal knowledge of this ban by management. Beauchamp, too, told Drapeau on at least one occasion that he had to leave her apartment, and she asked him to give back his apartment key. She also reminded Drapeau that he had been banned from the apartment by management. However, Drapeau continued to return to the apartment.

[5]     On January 18, 2015, Drapeau had been drinking alcohol. At approximately 2:00 or 3:00 a.m., he and some of his friends came to his mother's apartment, and Drapeau used his key to unlock the apartment door. Upon discovering that a chair had been placed in front of the door to block the entrance, Drapeau forced the door open. He asked Beauchamp for the keys to her car, which she refused. Drapeau's friends then left and he fell asleep on the mattress in the living room. Beauchamp then called the police to report that Drapeau was trespassing.

[6]     Officers Elizabeth McKinney and Nathan Jones from the Evansville Police Department arrived at Beauchamp's apartment at approximately 5:30 a.m. Before her arrival, Officer McKinney had been given an alert from the police department "system" that Drapeau had been banned from the apartment complex by the property management and another police officer. Tr. at 35. Officer McKinney was wearing a body camera that recorded the entire

interaction from the time she and Officer Jones entered the Beauchamp residence to the time they left.

[7] Drapeau was asleep on a mattress in the living room when the officers entered. Beauchamp informed the officers that she wanted Drapeau to leave, so the officers awoke him and informed him he must leave the apartment. Officer McKinney repeatedly offered to take Drapeau to a shelter or a friend's house. Drapeau told the officers they "should leave," gesturing toward the door. State's Ex. 1 at 5:41:51 a.m. Drapeau then turned toward the door himself, and Officer McKinney grabbed his arm and told him to "come here." *Id*. at 5:41:55 a.m. Although it cannot be seen on the video, it is undisputed that Drapeau pulled away from Officer McKinney's grip and swung his fist at her. Officer McKinney ducked so that Drapeau's strike never hit her.

[8] Drapeau then backed toward the door and held his hands up as Officer Jones pointed a taser at him. Officer Jones fired his taser at Drapeau while his hands were still up in the air. Drapeau was hit with two taser darts and fell onto his back onto the floor, yelling, "Don't do it." *Id*. at 5:42:02 a.m. Officer McKinney yelled, "Put your hands behind your back" while the taser was cycling. *Id*. at 5:42:04 a.m. The sound of the taser operating continued while Drapeau was lying on the floor with his hands held up in front of his face, repeatedly screaming, "Stop." *Id*. Officer McKinney then told Drapeau to put his hands behind his back or he was "going to get it again." *Id*. at 5:42:21. Drapeau continued to yell, "Stop," and "Stop, please." *Id*.

[9] Although the video from the body camera is too dark to see what was happening while Drapeau was on the floor, there was the sound of scuffling, which lasted approximately forty seconds. *Id*. The officers loudly instructed Drapeau to turn over onto his stomach and tried to assist him in doing so as he yelled, "I'm trying." *Id*. at 5:42:33 a.m. After an inaudible statement from one of the officers, Drapeau yelled, "I'm trying to, I'm trying to." *Id*. at 5:42:35 a.m. One of the officers then said, "let go," to which Drapeau replied, "I'm trying to." *Id*. at 5:42:41 a.m. There was the continued sound of scuffling, then Drapeau yelled, "don't hurt me." *Id*. at 5:42:50 a.m. Officer McKinney shouted "stop" several times, then asked, "Are you done?" *Id*. at 5:42:59 a.m. Drapeau said, "yes." *Id*. at 5:43:00 a.m. The officers handcuffed Drapeau, assisted him in standing up, and removed him from the apartment.

[10] Drapeau was charged with attempted battery against a public safety officer, based on his attempt to strike Officer McKinney. Appellant's App. at 16-17. He was also charged with forcibly resisting law enforcement, based on his failure to place his hands behind his back as ordered after he had been tased. *Id*.; Tr. at 52. And Drapeau was charged with criminal trespass for not having a contractual interest in Beachamp's property, yet knowingly entering that property after having been denied entry by Beauchamp or her agent. *Id*. at 17. At trial, the video tape from Officer McKinney's body camera was played for the court and entered into evidence as State's Exhibit 1.

[11] Officer McKinney testified for the State. She stated that, when Drapeau started to move toward the door of the apartment, there were knives lying around, and

so she grabbed his arm. She testified that Drapeau then pulled his arm away from her and, as his body turned, he swung at her with his right fist. She testified that Officer Jones then shot Drapeau with two taser darts, but she did not know how many times Officer Jones "recycled" the taser by pressing the trigger to send electric shocks into Drapeau. *Id*. at 42, 44-45. Officer McKinney testified that taser guns are designed to temporarily incapacitate a person's muscles by shooting electricity that flows from the taser to the dart that is lodged in the person's body. She stated that the goal of tasing someone is to make them unable to move, although the taser does not always incapacitate the person. She testified that the "zizzing" sound while Drapeau was being tased was the sound of the taser recycling, although she did not know if Drapeau was actually receiving the shocks. *Id.* at 46. Officer McKinney also stated that Officer Jones' taser would have had a computerized component that showed how many times the taser had been "deployed" in this incident. Id. at 45. She stated that that information could be downloaded and printed out, but no such information was available at the trial. Officer McKinney then testified that, "[w]hile he was not being cycled," Drapeau tensed up his body and refused to put his hands behind his back when told to do so.[2] *Id*. at 33, 52.

---

[2] Officer McKinney testified as follows:

> When he was, when I was giving him loud verbal commands to get on his stomach[,] he was on his side like this and refusing to roll onto his stomach and put his hand behind his back, and once he did roll onto his stomach, Officer Jones was able to get his right arm out, but his left arm was tucked up under him and I was trying to get it out from under

[12] In his defense, Drapeau testified that the apartment complex had new management who had seen him at Beauchamp's apartment several times but never told him to leave. He also testified he was shocked "several times" by the taser. *Id*. at 59. He stated that the shocks made him "clinch up" such that he "couldn't really like move." *Id*. He stated that, after he was tased, he "couldn't move [his] upper body," and he was "very tense." *Id*.

[13] The trial court found Drapeau guilty of attempted battery, criminal trespass, and resisting law enforcement. Drapeau appeals only the latter two convictions.

# Discussion and Decision

### *Issue One: Insufficiency of the Evidence*

[14] Drapeau contends that the evidence is insufficient to support the criminal trespass and resisting law enforcement convictions. Our standard of review in a sufficiency of the evidence claim is clear:

> [W]e examine only the probative evidence and reasonable inferences that support the [judgment]. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we

---

him to place him into custody and he wouldn't do that on his own, he wouldn't bring his arm out from underneath him.

Tr. at 33.

consider only the evidence most favorable to the trial court ruling
and affirm the conviction unless no reasonable fact-finder could
find the elements of the crime proven beyond a reasonable doubt.

*Pillow v. State*, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations and
quotation marks omitted).

*Criminal Trespass*

[15] Pursuant to Indiana Code Section 35-43-2-2(b)(1) (2014), to prove Drapeau
committed criminal trespass as a Class A misdemeanor, the State had to show
that Drapeau did not have a contractual interest in Beauchamp's apartment, yet
he knowingly or intentionally entered that property after having been denied
entry by Beauchamp or the owner of the apartment complex or their agents. It
is undisputed that Drapeau intentionally entered Beauchamp's apartment on
January 18, 2015. Thus, on appeal Drapeau argues (1) that he had a
contractual interest in the apartment and (2) that he had not been denied entry
by Beauchamp, the apartment complex, or their agents.

[16] There was sufficient evidence presented that Drapeau had no contractual
interest in Beauchamp's apartment. The State's burden of proof on this element
of the criminal trespass statute is clear:

> "Contractual interest," as that phrase is used in the criminal
> trespass statute, refers to the right to be present on another's
> property, arising out of an agreement between at least two parties
> that creates an obligation to do or not to do a particular thing.
> *Taylor v. State*, 836 N.E.2d 1024, 1026 (Ind. Ct. App. 2005), *trans.
> denied*. "[T]he State need not 'disprove every conceivable

contractual interest' that a defendant might have obtained in the real property at issue." *Lyles v. State*, 970 N.E.2d 140, 143 (Ind. 2012) (quoting *Fleck v. State*, 508 N.E.2d 539, 541 (Ind. 1987)). "[T]he State satisfies its burden when it disproves those contractual interests that are reasonably apparent from the context and circumstances under which the trespass is alleged to have occurred." *Id.*

*Semenick v. State*, 977 N.E.2d 7, 10 (Ind. Ct. App. 2012), *trans. denied*; *see also Lyle*, 970 N.E.2d at 143 n.2 (noting that a "contractual interest in the property" is a right, title, or legal share of real property arising out of a binding agreement between two or more parties). Here, there was evidence that Drapeau was not listed on the lease of the apartment and that the property manager of the apartments had, in fact, banned Drapeau from not only Beauchamp's apartment but the entire apartment complex. Moreover, Beauchamp testified that she had also asked Drapeau to return his apartment key and leave the apartment, which showed that she and Drapeau had not entered into an agreement that Drapeau had a contractual interest in the apartment. This is sufficient evidence that Drapeau had no contractual interest in Beauchamp's apartment.[3]

---

[3] Drapeau cites no statute or case law for his claim that his periodic contributions of food to the household created a contractual interest in the property, and we have found none. Therefore, that argument is waived. Ind. Appellate Rule 46(A)(8)(a) ("Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on."); *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) (noting that the failure to support arguments with appropriate citations to legal authority and record evidence waives those arguments for our review).

[17]     There was also sufficient evidence that Drapeau had been denied entry to Beauchamp's apartment by both Beauchamp and the apartment complex management.[4]  Under the statute, a person can be "denied entry by means of: (1) personal communication, oral or written; (2) posting or exhibiting a notice at the main entrance . . . or (3) a hearing authority or court order . . . " I.C. § 35-43-2-2(c).  Officer McKinney testified that she viewed on the police "record system" a notification that, in November 2014, the apartment complex and an Evansville police officer had banned Drapeau from the apartment complex.  Tr. at 35.  She also testified that she believed Drapeau had been notified of the ban because, if he had not, that would have been noted on the police system.  *Id*. Drapeau testified that he did have actual knowledge of the ban that was issued by apartment management in November 2014.  And Beauchamp testified that she had told Drapeau in the past that "he had to leave" the apartment.  *Id*. at 11.  This is sufficient evidence that Drapeau had been denied entry onto the premises by both Beauchamp and the apartment manager.  Drapeau's claim to the contrary is simply a request that we reweigh the evidence, which we will not do.

---

[4] Under the criminal trespass statute as applied to an apartment, either the leaseholder or the owner or both may deny entry to the apartment. *Johnson v. State*, 38 N.E.2d 686, 689 (Ind. Ct. App. 2015) (citing *Walls v. State*, 993 N.E.2d 262 (Ind. Ct. App. 2013)), *trans. denied*.

[18]     Drapeau also argues that there was insufficient evidence that he forcibly resisted law enforcement. The State based its resisting law enforcement charge on Drapeau's failure to put his arms behind his back while he was laying on the floor after having been shocked with Officer Jones' taser.[5] Thus, the only actions relevant to the resisting law enforcement charge are the actions Drapeau took *after* he had swung at Officer McKinney.

[19]     Under Indiana Code Section 35-44.1-3-1(a)(1), "[t]he basic offense of resisting law enforcement has five essential elements: that [the defendant] (1) knowingly or intentionally (2) forcibly (3) resisted, obstructed, or interfered with (4) a law enforcement officer, (5) while the officer was lawfully engaged in the execution of the officer's duties." *K.W. v. State*, 984 N.E.2d 610, 612 (Ind. 2013). It is clear from the body camera video that Drapeau had his hands up in the air at the time Officer Jones shot him with the taser. Therefore, at that point in time, Drapeau was not resisting law enforcement. It is also clear from the video that Drapeau fell onto the floor and immediately put his hands back up in the air in front of his face after he was first shocked with the taser. Drapeau continued to hold his hands up in front of his face, yelling "stop," while the sound of the taser cycling can be heard on the video. State's Ex. 1 at 5:42:04 a.m.

---

[5] The State based its attempted battery charge on Drapeau's attempt to hit Officer McKinney with his fist.

Therefore, at this point too Drapeau was not in any way resisting law enforcement.

[20] However, the State argues that Drapeau resisted law enforcement by failing to place his hands behind his back when he was on the floor, after he was tased. Drapeau counters that there is insufficient evidence that he used "force" at this point, as required under the statute. One forcibly resists when "strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties." *Spangler v. State*, 607 N.E.2d 720, 723 (Ind. 1993). It is true, as Drapeau points out, that "merely walking away from a law-enforcement encounter, leaning away from an officer's grasp, or twisting and turning a little bit against an officer's actions do not establish 'forcible' resistance." *K.W.*, 984 N.E.2d at 612 (quotations and citations omitted). However, as our supreme court has pointed out, there is no bright-line test for whether a defendant acts "forcibly"; rather, such determinations must be made on a case-by-case basis, with guidance from our case law. *Walker v. State*, 998 N.E.2d 724, 728 (Ind. 2013). Thus, Indiana courts have held that "showing strength and a threat of violence" is forcible resistance, *Walker*, 998 N.E.2d at 727-28; that "aggressively pulling away" from an officer trying to arrest is forcible resistance, *Glenn v. State*, 999 N.E.2d 859, 862 (Ind. Ct. App. 2013); that "starting to pull away" from an officer and keeping one's arms underneath oneself to prevent handcuffing are forcible resistance, *Lopez v. State*, 926 N.E.2d 1090, 1093-94 (Ind. Ct. App. 2010), *trans. denied*; and that stiffening one's arms to avoid handcuffing is forcible resistance, *Graham v. State*, 903 N.E.2d 963,

965-66 (Ind. 2009) (citing *Johnson v. State*, 833 N.E.2d 516, 517 (Ind. Ct. App. 2005)).

[21] Here, the video provides evidence that there was a struggle between Drapeau and the officers while they were attempting to handcuff him and after Officer Jones had ceased using his taser. Although the struggle cannot be seen in the video because it was too dark, it was reasonable for the trial court to infer from the forty seconds of scuffling sounds and shouting that Drapeau was struggling against the officers as they were trying to handcuff him. In addition, Officer McKinney testified that Drapeau refused to place his hands behind his back when ordered to do so. Thus, this case is more like *Lopez* than *K.W.*; that is, there is sufficient evidence that Drapeau did not just "twist . . . and turn . . . a little bit," *K.W.*, 984 N.E.2d at 612, but actually struggled with the officers, kept his arm underneath his body, and refused to move his hands into a position where they could be handcuffed,[6] *Lopez*, 926 N.E.2d at 1093-94.

[22] Drapeau also argues that the police officers engaged in excessive force and thus were not "lawfully engaged in the execution of their duties" as required under

---

[6] It might have been a legitimate trial strategy for Drapeau to rebut Officer McKinney's testimony by further examining the voluntariness of his "refusal" to put his hands behind his back after being tased, as he implies in his appellate brief. *See* I.C. § 35-41-2-1(a) (providing a person only commits a criminal offense if he "voluntarily engages in the conduct in violation of the statute defining the offense"). However, Officer McKinney's testimony is sufficient to establish the voluntariness of his actions, and Drapeau never elicited evidence at trial to demonstrate that he was incapable of complying with the officers' commands because the taser had immobilized him. For example, Drapeau did not call Officer Jones to testify as to how many times and when he had tased Drapeau. Drapeau did not subpoena the records to show how many times Officer Jones triggered his taser. And Drapeau did not present evidence as to the effects of being tased or how long those effects might last. Drapeau cannot now rely upon the lack of such evidence as proof that he was incapable of complying.

the statute. Appellant's Br. at 9. He notes that, after he was tased, "he was not fleeing, had been overcome by the officers, and did not present an immediate threat to their safety or anyone else's." *Id*. at 10. Although it is not entirely clear from his briefs, Drapeau's argument seems to be that he was justified in struggling against the officers because they were using excessive force in repeatedly tasing him.

[23] We have recently explained the law on excessive force within the context of a resisting law enforcement charge:

> The general rule in Indiana is that "a private citizen may not use force in resisting a peaceful arrest by an individual who he knows, or has reason to know, is a police officer performing his duties regardless of whether the arrest in question is lawful or unlawful." *Shoultz v. State*, 735 N.E.2d 818, 823 (Ind. Ct. App. 2000) (quoting *Casselman v. State*, 472 N.E.2d 1310, 1315 (Ind. Ct. App. 1985)), *trans. denied*. However, when an officer uses unconstitutionally excessive force in effecting an arrest, that officer is no longer lawfully engaged in the execution of his or her duty. *Shoultz*, 735 N.E.2d at 823.

> Claims that law enforcement officers have used excessive force in the course of an arrest of a free citizen are analyzed under the Fourth Amendment to the United States Constitution and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Because the Fourth Amendment test of reasonableness is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id*. at 396.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id*. However, the "reasonableness" inquiry in an excessive force case is an objective one; the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id*. at 396-97.

*Patterson v. State*, 11 N.E.3d 1036, 1039-40 (Ind. Ct. App. 2014).

[24] Here, it is clear that the officers' actions of grabbing Drapeau as he moved in the direction of knives and tasing him after he swung at Officer McKinney were objectively reasonable and not excessive. Quite obviously, a reasonable officer in such a situation would suspect that Drapeau posed a threat to the safety of the officers or others. *Graham*, 490 U.S. at 395. And, although Drapeau's hands were in the air at the exact moment he was tased, he had just swung at a police officer literally seconds before that. Therefore, it was objectively reasonable for Officer Jones to tase him. Furthermore, as previously noted, after being tased Drapeau "actively resisted" law enforcement by struggling with the officers. Thus, it was objectively reasonable for Officer Jones to continue tasing Drapeau until he became compliant. *Id*.

### Issue Two: *Variance Between the Pleading and Proof*

[25] Finally, Drapeau argues that there was a material and fatal variance between the crime of criminal trespass charged and the theory and evidence of criminal trespass presented at trial. Our supreme court has recently summarized the law on variances:

> Because the charging information advises a defendant of the accusations against him, the allegations in the pleading and the evidence used at trial must be consistent with one another. *Simmons v. State*, 585 N.E.2d 1341, 1344 (Ind. Ct. App. 1992). A variance is an essential difference between the two. *Mitchem v. State*, 685 N.E.2d 671, 677 (Ind. 1997). Not all variances, however, are fatal. *Id*. Relief is required only if the variance (1) misled the defendant in preparing a defense, resulting in prejudice, or (2) leaves the defendant vulnerable to future prosecution under the same evidence. *Winn v. State*, 748 N.E.2d 352, 356 (Ind. 2001).

*Blount v. State*, 22 N.E.3d 559, 569 (Ind. 2014).

[26]   The State points out that Drapeau failed to raise an objection at trial regarding the alleged variance, and argues that this failure waives the issue for appeal. Appellee Br. at 21. As we recently noted regarding waiver,

> Generally, a party waives an issue if it is raised for the first time on appeal. *See Townsend v. State*, 632 N.E.2d 727, 730 (Ind. 1994). "However, we may bypass an error that a party procedurally defaults when we believe that the error is . . . fundamental." *Id*. (quoting *Hart v. State,* 578 N.E.2d 336, 337 (Ind. 1991)). As our supreme court recently stated: "An error is fundamental, and thus reviewable despite failure to object, if it made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Young v. State*, 30 N.E.2d 719, 726 (Ind. 2015) (quotation marks omitted).

*Hilligoss v. State*, No. 34A02-1506-CR-529, 2015 WL 7280731, *2 (Ind. Ct. App. Nov. 18, 2015). The rule against fatal variances is designed to protect a defendant's basic

> constitutional right to be informed of the nature and cause of the accusation in sufficient detail to enable him to prepare his defense, to protect him in the event of double jeopardy[,] and to define the issues so that the court will be able to determine what evidence is admissible and to pronounce judgment.

*Reed v. State*, 438 N.E.2d 704, 705 (Ind. 1982) (citation omitted). Because the error of a fatal variance is fundamental, *Young*, 30 N.E.3d at 726, we will address Drapeau's variance claim despite his failure to raise the claim at trial.

[27] Drapeau argues that he was charged with entering his mother's apartment "after having been denied entry" by Beauchamp or her agent, pursuant to Indiana Code Section 5-43-2-2(b)(1), but that the proof offered by the State at trial was designed to show that he "refuse[d] to leave the real property of another person after having been asked to leave by the other person or that person's agent," pursuant to Indiana Code Section 35-43-2-2(b)(2). He argues this is a fatal variance.

[28] We find no variance here, fatal or otherwise. The charging information alleged that Drapeau committed criminal trespass by entering Beauchamp's apartment "after having been denied entry." Appellant's App. at 17. And the State's proof was consistent with that charge. The State presented evidence that Drapeau previously had been denied entry to Beauchamp's apartment by both

Beauchamp and by the apartment complex. That evidence was presented through Beauchamp's testimony, Officer McKinney's testimony, and Drapeau's own admission that he was aware of the November 2014 ban by the apartment complex yet entered Beauchamp's apartment anyway.

[29] Drapeau bases his claim that the evidence varied from the charge only on the following sentence during the prosecutor's opening statement: "The allegations are that Mr. Drapeau was in his mother's apartment, she wanted him to leave, she called the Police, the Police arrived, tried to get him to leave on his own, he would not . . . " Appellant's Br. at 12. Drapeau claims this was evidence that he had refused to leave after being asked to leave, which is a different criminal trespass charge than the one on the charging information. *Id.* However, this sentence in the prosecutor's opening statement was not substantive evidence or a recitation of the charge against Drapeau; it was merely a summary of the facts the prosecutor intended to prove. *See, e.g.*, *Schuh v. Silcox*, 581 N.E.2d 926, 927 (Ind. Ct. App. 1991). Moreover, none of the State's actual evidence presented at trial was consistent with a charge that Drapeau refused to leave after being asked to leave; rather, it was consistent with the charge that Drapeau entered the apartment after having been denied entry by both his mother and the apartment complex.[7]

---

[7] Moreover, even if the alleged variance existed, it would not have been fatal. Drapeau was not misled in preparing his defense, as his own evidence was directed toward proving he had not been previously denied entry to Beauchamp's apartment. And, "under Indiana's double jeopardy jurisprudence, [Drapeau would not be] vulnerable to being tried again for the same crime." *Winn v. State*, 748 N.E.2d at 357; *see also, e.g.*, *Scott v. State*, 859 N.E.2d 749, 752 (Ind. Ct. App. 2007) (explaining Indiana's Double Jeopardy Clause

[30] The State presented sufficient evidence to support Drapeau's convictions for criminal trespass and resisting law enforcement. And there was no fatal variance between the pleadings and the proof. Accordingly, we affirm his convictions.

[31] Affirmed.

Baker, J., and Altice, J., concur.

---

jurisprudence). Thus, Drapeau would not have been prejudiced in any way by the alleged variance. *See Blount*, 22 N.E.3d at 569.